# STOCK PURCHASE AGREEMENT

By and Among

NATROL, INC.

and

Thomas E. Roark
John Yves Morin
Dwight Otis
Andrew M. Esposito, Jr.

and

PROLAB NUTRITION, INC.

# TABLE OF CONTENTS

   Page

ARTICLE I. PURCHASE AND SALE OF SHARES ............................... 1
    Section 1.01. Purchase and Sale of Shares. .............................. 1
    Section 1.02. Total Purchase Price ..................................... 2
    Section 1.03. Closing Financial Statements; Total Purchase Price Adjustment ..... 3
    Section 1.04. Closing .............................................. 3
    Section 1.05. Closing Deliveries ..................................... 4
    Section 1.06. Stockholders' Representative ............................. 5
    Section 1.07. Further Assurances ..................................... 7
    Section 1.08. Transfer Taxes ........................................ 7

ARTICLE II. NON-COMPETITION; POST-CLOSING EMPLOYMENT ............. 7
    Section 2.01. Non-Competition Agreement ............................. 7
    Section 2.02. Post-Closing Employment ............................... 7
    Section 2.03. Options .............................................. 7

ARTICLE III. REPRESENTATION AND WARRANTIES OF THE STOCKHOLDERS .. 8
    Section 3.01. Making of Representations and Warranties ................. 8
    Section 3.02. Ownership of Capital Stock .............................. 8
    Section 3.03. Authority of Stockholders ............................... 9
    Section 3.04. Organization, Existence and Authority ..................... 9
    Section 3.05. Capitalization ......................................... 10
    Section 3.06. Subsidiaries; Investments ................................ 11
    Section 3.07. Financial Statements ................................... 11
    Section 3.08. Absence of Undisclosed Liabilities ........................ 11
    Section 3.09. Absence of Certain Developments ........................ 12
    Section 3.10. Accounts Receivable ................................... 12
    Section 3.11. Transactions with Affiliates ............................. 12
    Section 3.12. Title to Properties .................................... 13
    Section 3.13. Tax Matters .......................................... 14
    Section 3.14. Contracts and Commitments ............................. 15
    Section 3.15. Intellectual Property Rights ............................. 16
    Section 3.16. Litigation ............................................ 18
    Section 3.17. Permits; Compliance with Laws .......................... 18
    Section 3.18. Inventories .......................................... 19
    Section 3.19. Labor Laws .......................................... 19
    Section 3.20. Information Supplied to Natrol .......................... 20
    Section 3.21. Investment Banking; Brokerage .......................... 20

# STOCK PURCHASE AGREEMENT

By and Among

NATROL, INC.

and

Thomas E. Roark
John Yves Morin
Dwight Otis
Andrew M. Esposito, Jr.

and

PROLAB NUTRITION, INC.

# TABLE OF CONTENTS

|  | Page |
|---|---|
| **ARTICLE I. PURCHASE AND SALE OF SHARES** | |
| Section 1.01. Purchase and Sale of Shares. | 1 |
| Section 1.02. Total Purchase Price | 1 |
| Section 1.03. Closing Financial Statements; Total Purchase Price Adjustment | 2 |
| Section 1.04. Closing | 3 |
| Section 1.05. Closing Deliveries | 3 |
| Section 1.06. Stockholders' Representative | 4 |
| Section 1.07. Further Assurances | 5 |
| Section 1.08. Transfer Taxes | 7 |
| | 7 |
| **ARTICLE II. NON-COMPETITION; POST-CLOSING EMPLOYMENT** | 7 |
| Section 2.01. Non-Competition Agreement | 7 |
| Section 2.02. Post-Closing Employment | 7 |
| Section 2.03. Options | 7 |
| | 7 |
| **ARTICLE III. REPRESENTATION AND WARRANTIES OF THE STOCKHOLDERS** | 8 |
| Section 3.01. Making of Representations and Warranties | 8 |
| Section 3.02. Ownership of Capital Stock | 8 |
| Section 3.03. Authority of Stockholders | 8 |
| Section 3.04. Organization, Existence and Authority | 9 |
| Section 3.05. Capitalization | 9 |
| Section 3.06. Subsidiaries; Investments | 10 |
| Section 3.07. Financial Statements | 11 |
| Section 3.08. Absence of Undisclosed Liabilities | 11 |
| Section 3.09. Absence of Certain Developments | 11 |
| Section 3.10. Accounts Receivable | 12 |
| Section 3.11. Transactions with Affiliates | 12 |
| Section 3.12. Title to Properties | 12 |
| Section 3.13. Tax Matters | 13 |
| Section 3.14. Contracts and Commitments | 14 |
| Section 3.15. Intellectual Property Rights | 15 |
| Section 3.16. Litigation | 16 |
| Section 3.17. Permits; Compliance with Laws | 18 |
| Section 3.18. Inventories | 18 |
| Section 3.19. Labor Laws | 19 |
| Section 3.20. Information Supplied to Natrol | 19 |
| Section 3.21. Investment Banking; Brokerage | 20 |
| | 20 |

Section 3.22. Employee Benefit Programs. .................................. 21
Section 3.23. Environmental Matters ....................................... 23
Section 3.24. Insurance .................................................. 24
Section 3.25. Relationship with Customers and Suppliers .................... 24
Section 3.26. Investment Representations .................................. 25
Section 3.27. Corporate Records; Copies of Documents ..................... 26

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF NATROL. ........ 26
Section 4.01. Making of Representations and Warranties ................... 26
Section 4.02. Organization and Corporate Power. .......................... 26
Section 4.03. Authority .................................................. 27
Section 4.04. Investment Banking; Brokerage .............................. 27

ARTICLE V. SURVIVAL; INDEMNIFICATION ............................ 27
Section 5.01. Survival of Representations, Warranties, Etc ................. 27
Section 5.02. Indemnification by the Stockholders ......................... 28
Section 5.03. Limitations on Indemnification by Stockholders .............. 29
Section 5.04. Indemnification by Natrol. .................................. 30
Section 5.05. Limitations on Indemnification by Natrol. ................... 31
Section 5.06. Notice; Defense of Claims .................................. 31
Section 5.07. Recoveries ................................................. 33
Section 5.08. Satisfaction of Stockholder Indemnification Obligations. .... 33

ARTICLE VI. MISCELLANEOUS. ........................................ 33
Section 6.01. Law Governing ............................................. 33
Section 6.02. Notices .................................................... 33
Section 6.03. Prior Agreements Superseded. ............................... 34
Section 6.04. Assignability .............................................. 34
Section 6.05. Fees and Expenses .......................................... 34
Section 6.06. Publicity and Disclosures ................................... 35
Section 6.07. Captions and Gender ........................................ 35
Section 6.08. Execution in Counterparts .................................. 35
Section 6.09. Certain Remedies; Severability ............................. 35
Section 6.10. Amendments; Waivers ....................................... 35

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement is made as of this 8th day of October, 1999, by and among Natrol, Inc., a Delaware corporation ("Natrol"), and Thomas E. Roark ("Mr. Roark"), John Yves Morin ("Mr. Morin"), Dwight Otis ("Mr. Otis") and Andrew M. Esposito, Jr. (Mr. Esposito") (Mr. Roark, Mr. Morin, Mr. Otis and Mr. Esposito are sometimes referred to herein individually as a "Stockholder" and collectively as the "Stockholders") and PROLAB Nutrition, Inc., a Connecticut corporation ("Prolab").

### WITNESSETH

WHEREAS, Prolab is in the business of marketing and supplying sports-related dietary supplements and other health and nutrition products to its customers (the "Business");

WHEREAS, the Stockholders are each the record and beneficial owners of the number of shares, of any series, of common stock, no par value, of Prolab set forth opposite their names on the attached Exhibit A (the "Shares");

WHEREAS, the Shares represent all of the issued and outstanding capital stock of the Prolab;

WHEREAS, the Stockholders desire to sell to Natrol, and Natrol desires to purchase from the Stockholders, the Shares, subject to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### ARTICLE 1. PURCHASE AND SALE OF SHARES.

Section 1.01. Purchase and Sale of Shares. Subject to the terms and conditions of this Agreement and in reliance on the representations, warranties and covenants herein set forth, Natrol hereby agrees to purchase from the Stockholders, and the Stockholders hereby agree to sell and deliver to Natrol, at the Closing (as hereinafter defined in Section 1.04 hereof), the Shares, free and clear of any and all liens, claims, options, charges, encumbrances, rights or restrictions of any nature ("Claims"). At the Closing, the Stockholders shall deliver or cause to be delivered to Natrol certificates representing all of the Shares. Such stock certificates shall be duly endorsed in blank for transfer or shall be presented with stock powers duly executed in blank, with such signature guarantees and such other documents as may be reasonably required by Natrol to effect a valid transfer of such Shares by the Stockholders, free and clear of any and all Claims.

Section 1.02. Total Purchase Price.

(a) In consideration of the sale by the Stockholders to Natrol of the Shares and in reliance upon the representations and warranties of the Stockholders herein contained and the other terms and conditions hereof and subject to the satisfaction of all of the conditions contained herein, Natrol agrees to pay to the Stockholders, at the times set forth herein, a total aggregate consideration (the "Total Purchase Price"), which shall be allocated among the Stockholders on a pro rata basis as set forth on Schedule 1.02, equal to Thirty Million Dollars ($30,000,000) minus the Adjustment Amount, if any, to be determined and paid in accordance with Section 1.03. The Total Purchase Price shall be satisfied by delivery by Natrol to the Stockholders (allocated among the Stockholders on a pro rata basis as set forth on Schedule 1.02) of: (a) Twenty Nine Million Dollars ($29,000,000) (the "Cash Payment") and (b) 124,270 shares of common stock, par value $.01 per share, of Natrol ("Natrol Common Stock") (the "Stock Payment").

(b) The Cash Payment shall be paid by Natrol at the Closing. The Stock Payment shall be held by Natrol as security in favor of Natrol for, and shall be reduced to the extent of, all Losses (as defined in Section 5.02 hereof) incurred by Prolab as a result of: (i) the litigation styled as *Prolab Nutrition, Inc. v. Basic Research, LLC, et al.*, Case No. C2 99-396, now pending in the Federal District Court for the Southern District of Ohio (the "Current Lawsuit"); (ii) any Action or potential Action between one or more of the parties to the Current Lawsuit and/or any related or affiliated parties or governmental entity arising out of or relating to the general state of facts alleged in the Current Lawsuit (collectively with the Current Lawsuit the "Basic Litigation"); and (iii) the patent/trademark dispute between Prolab, Ergogenix, LLC, Brink Training Systems and others described in Section 3.15 of the Disclosure Schedule (the "Patent Dispute"). Within ten (10) days following the last to occur of: (i) the date on which the Basic Litigation has been fully and finally resolved, by settlement between the parties, arbitration, court order (once all periods for appeal have expired) or otherwise; or (ii) the date on which the Patent Dispute is fully and finally resolved to the reasonable satisfaction of Natrol, Natrol shall issue or cause to be issued to the Stockholders (allocated among among the Stockholders on a pro rata basis as set forth on Schedule 1.02) that number of shares of Natrol Common Stock, if any, equal to (A) the Stock Payment less (B) that number of whole shares of Natrol Common Stock equal to the quotient of all Losses incurred by any Buyer Indemnified Party subsequent to the Closing Date in respect of the Basic Litigation and the Patent Dispute divided by $8.047 (as adjusted from time to time to reflect any stock dividend, stock split, reverse stock split, combination, recapitalization, reclassification or similar event affecting shares of Natrol Common Stock). In the event the Stock Payment held as security by Natrol is insufficient to compensate the Buyer Indemnified Parties for such Losses, the Stockholders shall be jointly and severally liable for, and shall promptly pay, any deficiency to such Buyer Indemnified Parties. In the event that payment of such a deficiency is due from the Stockholders but is not paid, such obligation may be satisfied by set-off against any amounts payable to any Stockholder pursuant to this Agreement or

otherwise. For purposes hereof, the term "Action" shall mean any counterclaim, crossclaim or other action, suit, arbitration, inquiry, proceeding or investigation by or before any court, arbitration tribunal or governmental entity.

Section 1.03. <u>Closing Financial Statements; Total Purchase Price Adjustment</u>.

(a) Prior to the execution of this Agreement the Stockholders have engaged the public accounting firm of Sansiveri, Kimball & McNamee LLP to conduct an audit in accordance with generally accepted auditing standards ( the "Audit") of the financial statements of Prolab for the year ended December 31, 1998, and for the period beginning January 1, 1999 and ending on the Closing Date ( the "Current Stub Period") ( the "Closing Date Financial Statements"), which financial statements are to be prepared in accordance with generally accepted accounting principles and practices, applied consistently with past reporting periods of Prolab ("GAAP"). In connection with the Audit and the preparation of the balance sheet included in the Closing Date Financial Statements ( the "Closing Balance Sheet"), promptly following the Closing Natrol shall cause to be conducted a physical count and valuation of the inventory of Prolab, using a valuation method consistent with GAAP. Such physical count shall take place on not less than five business days notice to the Stockholders, and the Stockholders shall be entitled to be present. The results of the physical count and valuation shall, in the absence of manifest error, be final and binding on the parties. As soon as practicable following the Closing but in any event by the later of 75 days following the Closing Date or 10 days following completion of the Audit, Natrol shall deliver to the Stockholders the audited financial statements, including the Closing Date Balance Sheet, together with a calculation of the Adjustment Amount. The "Adjustment Amount" shall be the amount (if any) by which the Net Tangible Assets (as defined below) of Prolab, as shown on the Closing Balance Sheet, are less than the sum of Three Million, Two Hundred Fifty Thousand Dollars ($3,250,000). On the basis of the Closing Balance Sheet, the Adjustment Amount shall reduce the Total Purchase Price and the Stockholders shall, on a joint and several basis, make prompt payment to Natrol of the Adjustment Amount. In the event that an Adjustment Amount is due from the Stockholders but is not paid, such obligation may be satisfied by set-off against any amounts payable to any Stockholder by Natrol pursuant to this Agreement or otherwise.

(b) For purposes of this Section 1.03, "Net Tangible Assets" shall mean Tangible Assets of Prolab, less total liabilities, and "Tangible Assets" shall mean total assets of Prolab less goodwill and general intangibles, in each case as reflected on either the Estimated Closing Balance Sheet or the Closing Balance Sheet, as the case may be, and determined in accordance with GAAP.

Section 1.04. <u>Closing</u>. The transactions contemplated by this Agreement shall be consummated at the closing (the "Closing") which will take place at the offices of Goodwin, Procter & Hoar LLP, Exchange Place, Boston, Massachusetts on October 8, 1999.

3

Notwithstanding the foregoing, the Closing may take place at such other place, time or date as may be mutually agreed upon in writing by the Stockholders and Natrol. The date of the Closing is referred to herein as the "Closing Date."

Section 1.05. Closing Deliveries.

(a) <u>Deliveries of Prolab and the Stockholders</u>. At the Closing, or in the case of item (i) below, at least five (5) and not more than seven (7) business days prior to the Closing Date, the Stockholders shall deliver or cause to be delivered, unless any such delivery shall be waived by Natrol in writing, the following:

(i) a letter from the auditors engaged by Prolab to audit its financial statements for the year ended December 31, 1998 and the Current Stub Period to the effect that such firm: (x) has had no indication from its audit activities to the date of such letter of a significant discrepancy in the financial statements contained in Section 3.07 of the Disclosure Schedule (as defined below); and (y) has found no reason to conclude that such statements will not be fully auditable by such firm within sixty (60) days after the Closing Date.

(ii) stock certificates representing all of the outstanding shares of capital stock of Prolab properly endorsed;

(iii) Non-competition Agreements (as defined in Section 2.01) properly executed by Messrs. Roark, Morin and Esposito;

(iv) resignations of Messrs Roark, Morin, Esposito and Otis from their positions as Directors of Prolab and all corporate offices held by them with Prolab;

(v) a General Release duly executed by each of the Stockholders in the form of <u>Exhibit 1.05A</u> attached hereto;

(vi) memorandum of Action of Board of Directors and all Stockholders of Prolab: (A) approving and ratifying all provisions of this Agreement and authorizing the Closing: and (B) canceling all obligations and waiving all rights of the parties to that certain Stockholders Agreement dated March 12, 1999 among Prolab and its stockholders;

(vii) evidence satisfactory to Natrol and its counsel of the repayment to Prolab of any outstanding loans or advances made by Prolab to any Stockholder or affiliate of any Stockholder, including a promissory note of Thomas E. Roark dated August 27, 1999 in the principal amount of $500,000; and

4

    (viii) evidence satisfactory to Natrol and its counsel that all of the Recommendations contained in Section VII.B of the Phase I Environmental Site Assessment Report issued on June 16, 1997 by HRP Associates, Inc., in respect of 11 Britton Drive, Bloomfield, CT 06002, have been adopted by Prolab.

  (b) <u>Deliveries of Natrol</u>. At the Closing, Natrol shall deliver or cause to be delivered, unless any such delivery shall be waived by the Stockholders in writing, wire transfers in immediately available funds to one or more bank accounts designated in writing by the Stockholders, in the aggregate amount equal to the Cash Payment, and in the amounts set forth on Schedule 1.02.

<u>Section 1.06</u>. <u>Stockholders' Representative</u>.

  (a) By the execution and delivery of this Agreement and by their act of surrendering certificates representing their Shares pursuant to this Agreement, each of the Stockholders hereby irrevocably constitutes and appoints, for the period beginning on the date hereof and ending on the later of the third anniversary of this Agreement or date on which all indemnity claims under Article V hereof are finally settled, Mr. Roark, his or her true and lawful agent and attorney-in-fact (the "Representative"), with full power of substitution, subject to the terms of the Representative Agreement dated of even date herewith among the Stockholders and the Representative and attached hereto as <u>Exhibit 1.06(a)</u>, to act in his name, place and stead with respect to all transactions contemplated by and all terms and provisions of this Agreement, and to act on his behalf in any dispute, litigation or arbitration involving this Agreement, and to do or refrain from doing all such further acts and things, and execute all such documents as the Representative shall deem necessary or appropriate in connection with the transactions contemplated by this Agreement, including, without limitation, the power:

    (i) to waive any condition to the obligations of the Stockholders to consummate the transactions contemplated by this Agreement, <u>provided</u>, <u>however</u>, that if the waiver of any condition could have a Material Adverse Effect (as defined in Section 3.01) on the Stockholders, such waiver must be approved by a majority in interest of the Stockholders;

    (ii) to act for the Stockholders with regard to matters pertaining to indemnification referred to in this Agreement and adjustments pursuant to Section 1.03, including the power to compromise any claim on behalf of the Stockholders;

    (iii) to do or refrain from doing any further act or deed on behalf of the Stockholders which the Representative deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement, as fully and completely as each Stockholder could do if personally present; and

5

Dec 18 01 09:19p    David Laufer    18059842069    p.13

(iv) to deliver all ancillary agreements, certificates and documents and to receive all notices and service of process on behalf of the Stockholders in connection with any claims or matters under this Agreement (and the Representative agrees to deliver copies of all such notices and service of process to the Stockholders).

(b) If Mr. Roark dies or otherwise becomes incapacitated and unable to serve as Representative, or is unwilling to serve as Representative, then a new Representative shall be selected by the affirmative vote of a majority in interest of the Stockholders to serve as the new Representative. The appointment of the Representative shall be deemed coupled with an interest and shall be irrevocable, and Natrol and Prolab and any other person may conclusively and absolutely rely, without inquiry, upon any action of the Representative on behalf of the Stockholders in all matters referred to herein. All notices delivered by Natrol or Prolab to the Representative (whether pursuant hereto or otherwise) for the benefit of the Stockholders shall constitute notice by Natrol or Prolab to the Stockholders. The Representative shall act for the Stockholders on all of the matters set forth in this Agreement in the manner the Representative believes to be in the best interest of the Stockholders and consistent with his obligations under this Agreement, but the Representative shall not be responsible to the Stockholders for any loss or damages the Stockholders may suffer by reason of the performance by the Representative of his duties under this Agreement, other than loss or damage arising from willful violation of the law or gross negligence in the performance of his duties under this Agreement.

The Stockholders agree to indemnify and hold harmless the Representative from and against any and all expenses (including attorneys' fees), judgments fines or other damages incurred by him in connection with, arising from or relating to the performance of his duties as Representative hereunder, if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Stockholders and, with respect to any criminal action or proceeding, had no reasonable belief his conduct was unlawful. Natrol and Prolab agree that the Stockholders may so indemnify the Representative.

(c) All actions, decisions and instructions of the Representative taken, made or given pursuant to the authority granted to the Representative pursuant to paragraph (a) above shall be conclusive and binding upon all of the Stockholders and no Stockholder shall have the right to object, dissent, protest or otherwise contest the same. Natrol and Prolab hereby acknowledge that the Representative may with respect to any particular action, decision or instruction solicit the consent of the Stockholders before acting.

(d) The provisions of this Section 1.06 are independent and severable, shall constitute an irrevocable power of attorney, coupled with an interest and surviving death or dissolutions, granted by the Stockholders to the Representative and shall be binding upon the executors, heirs, legal representatives, successors and assigns of each such Stockholder.

12/18/01    TUE 23:01    [TX/RX NO 6518]

(e)     Natrol and Prolab shall be entitled to rely conclusively on the instructions and decisions of the Representative as to any actions required or permitted to be taken by the Stockholders or the Representative hereunder, and no party hereunder shall have any cause of action against Natrol and Prolab for any action taken by Natrol or Prolab in reliance upon the instructions or decisions of the Representative.

Section 1.07.   Further Assurances.  The Stockholders and the Representative from time to time after the Closing at the request of Natrol and without further consideration shall execute and deliver further instruments of transfer and assignment and take such other action as Natrol may reasonably require to more effectively transfer and assign to, and vest in, Natrol the Shares free and clear of any and all Claims and all rights thereto, and to fully implement the provisions of this Agreement.

Section 1.08.   Transfer Taxes.  All transfer taxes, fees and duties under applicable law incurred in connection with the sale and transfer of the Shares under this Agreement will be borne and paid by the Stockholders, and the Stockholders shall promptly reimburse Prolab and Natrol for any such tax, fee or duty which it is required to pay under applicable law.

## ARTICLE II.  NON-COMPETITION; POST-CLOSING EMPLOYMENT.

Section 2.01.   Non-Competition Agreement.  As a material inducement to and a condition precedent of Natrol's purchase of the Shares, and associated goodwill, and in consideration of the payment by Natrol to the Stockholders of their pro rata portion of the Total Purchase Price and in consideration of their continued employment by Prolab following the Closing as provided for herein, each of Mr. Roark, Mr. Morin and Mr. Esposito shall execute and deliver on the Closing Date a Non-Competition Agreement in the form of Exhibit 2.01 attached hereto (the "Non-Competition Agreement") providing for a period of non-competition of five (5) years.

Section 2.02.   Post-Closing Employment.  Natrol shall cause Prolab to employ Messrs. Roark, Morin and Esposito commencing on the day following the Closing Date on an at will basis, at the base compensation and with the bonus arrangements as are set forth on the attached Schedule 2.02.

Section 2.03.   Options.  Promptly upon being notified by the Representative, on or after the Closing, of the recipients and their respective allotments, Natrol shall deliver duly executed option agreements pursuant to Natrol's then active stock option plan granting options (vesting in equal quarterly installments over a three year period) to purchase a total of 500,000 shares of common stock, par value $0.01 per share, of Natrol, to the persons, and in the respective allotments, identified by the Representative. Optionees shall execute and deliver option agreements in a form customarily used by Natrol.

## ARTICLE III. REPRESENTATION AND WARRANTIES OF THE STOCKHOLDERS.

Section 3.01. Making of Representations and Warranties. As a material inducement to Natrol to enter into this Agreement and consummate the transactions contemplated hereby, and notwithstanding any investigation made by Natrol, Prolab and each of the Stockholders hereby jointly and severally make to Natrol the representations and warranties contained in this Article III, except that the representations and warranties in Section 3.02 and 3.03 are made severally by each Stockholder as to himself. For purposes of this Agreement, references to a "Person" shall mean an individual, a corporation, an association, an estate, a trust, a partnership or any other entity or organization.

For purposes of this Agreement, references to the "knowledge" or "best knowledge" of, or "known" to, a Stockholder or Prolab, or words of similar meaning shall mean and be limited to such knowledge as any of the Subject Persons (as defined below) actually has or reasonably ought to have in the prudent exercise of his or her duties and responsibilities, it being understood that the following principles shall apply to the application of this definition:

(a) any matters set forth in a written document received, sent or acknowledged by any of Prolab or any Subject Person shall be deemed known whether or not any Subject Person has conscious knowledge of such matter;

(b) any matter known to counsel to, independent accountants for or other advisors of any Stockholder shall be deemed known whether or not any Subject Person has conscious knowledge of such matter; and

(c) the term "Subject Persons" means each of the following: (x) the Stockholders and (y) the senior executive officers and all other Persons named on Section 3.01 of the Disclosure Schedule hereto.

For purposes of this Agreement, references to "Material Adverse Effect" shall mean a material adverse effect on the properties, assets, business, condition (financial or otherwise), total surplus, results of operations or prospects of Prolab.

Section 3.02. Ownership of Capital Stock. Each Stockholder owns beneficially and of record the respective number of the Shares listed opposite such Stockholder's name on Schedule 1.02 hereto, free and clear of any and all Claims. Upon delivery to Natrol at the Closing of the certificates representing the Shares owned by such Stockholder duly endorsed in blank for transfer or with stock powers attached duly executed in blank, against delivery of the purchase price therefor, good and valid title thereto shall be transferred to Natrol, free and clear of any and all Claims.

8

Section 3.03. Authority of Stockholders.

(a) Each Stockholder has full authority, power and capacity to enter into this Agreement and each agreement, document and instrument to be executed and delivered by or on behalf of such Stockholder pursuant to or as contemplated by this Agreement and to carry out the transactions contemplated hereby and thereby. This Agreement and each agreement, document and instrument to be executed and delivered by such Stockholder or pursuant to or as contemplated by this Agreement constitute, or when executed and delivered by such Stockholder will constitute, valid and binding obligations of such Stockholder enforceable in accordance with their respective terms except as such enforceability may be limited by principles of equity with respect to specific performance, injunctive relief and other equitable remedies.

(b) The execution, delivery and performance by such Stockholder of this Agreement and each such agreement, document and instrument:

(i) do not and will not violate any laws, rules or regulations of the United States or any state or other jurisdiction applicable to such Stockholder, or require such Stockholder to obtain any approval, consent or waiver of, or to make any filing with, any Person (governmental or otherwise) that has not been obtained or made; and

(ii) do not and will not result in a breach of, constitute a default under, accelerate any obligation under or give rise to a right of termination of any indenture or loan or credit agreement or any other agreement, contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award to which such Stockholder is a party or by which the property of such Stockholder is bound or affected, or result in the creation or imposition of any mortgage, pledge, lien, security interest or other charge or encumbrance on any of the assets or properties of such Stockholder.

Section 3.04. Organization, Existence and Authority.

(a) Prolab is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut, and is duly qualified or registered as a foreign corporation (i) in each jurisdiction listed in Section 3.04 of the Disclosure Schedule delivered by the Stockholders under this Agreement (the "Disclosure Schedule") or (ii) in which Prolab is required to be licensed or qualified to conduct its business or own its properties, except where the failure to so qualify or register would not have a Material Adverse Effect on Prolab. Prolab has all requisite corporate power and authority, and all material and necessary authorizations, approvals, orders, licenses, certificates and permits to conduct its Business. True and complete copies of the articles of incorporation or equivalent

9

charter document and by-laws of Prolab has previously been delivered to Natrol. Prolab is not in violation of any term of its articles of incorporation and by-laws.

(b) Prolab has full corporate power and authority to enter into this Agreement and each agreement, document and instrument to be executed and delivered by or on its behalf pursuant to or as contemplated by this Agreement and to carry out the transactions contemplated hereby and thereby. This Agreement and each agreement, document and instrument to be executed and delivered by any of Prolab pursuant to or as contemplated by this Agreement constitute, or when executed and delivered by Prolab will constitute, its valid and binding obligation enforceable in accordance with their respective terms. The execution, delivery and performance by the Stockholders and Prolab of this Agreement and each agreement, document and instrument to be executed and delivered by any of them pursuant to this Agreement and the transactions contemplated hereby and thereby:

(i) do not and will not violate the articles of incorporation or by-laws of any of Prolab or any laws, rules or regulations of the United States or any state or other jurisdiction applicable to Prolab, or require Prolab to obtain any approval, consent or waiver of, or to make any filing with, any Person (governmental or otherwise), including without limitation any state insurance or similar regulatory authority, that has not been obtained or made; and

(ii) do not and will not result in a breach of, constitute a default under, accelerate any obligation under or give rise to a right of termination of any indenture or loan or credit agreement or any other agreement, contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award to which any of Prolab is a party or by which the property of any of Prolab is bound or affected, or result in the creation or imposition of any mortgage, pledge, lien, security interest or other charge or encumbrance on any of the assets or properties of any of Prolab.

Section 3.05. Capitalization.

(a) Section 3.05 of the Disclosure Schedule sets forth the authorized capital stock of each of Prolab and the number of issued and outstanding shares of Common Stock of Prolab, all of which shares are duly and validly issued, fully paid and nonassessable, were issued in compliance with all applicable state and federal securities laws and are owned beneficially and of record by the Stockholders as indicated in Section 3.05 of the Disclosure Schedule. No shares of capital stock of any of Prolab are held in its treasury. Except as set forth in Section 3.05 of the Disclosure Schedule, (i) there are no outstanding subscriptions, options, warrants, commitments, agreements, arrangements or commitments of any kind for or relating to the issuance, or sale of, or outstanding securities convertible into or exchangeable for, any shares of capital stock of any class or other equity interests of Prolab; (ii) no person