(vi) any documents evidencing any loan to an Employee Program that is a leveraged employee stock ownership plan.

(e) Except as set forth in Section 3.22 of the Disclosure Schedule, each Employee Program maintained as of the date hereof is subject to termination by the Board of Directors of Prolab without any further liability or obligation on the part of such Company or such Subsidiary to make further contributions to any trust maintained under any such Employee Program following such termination.

(g) For purposes of this Section 3.22:

(i) "Employee Program" means (A) all employee benefit plans within the meaning of ERISA Section 3(3), including, but not limited to, multiple employer welfare arrangements (within the meaning of ERISA Section 3(40)), plans to which more than one unaffiliated employer contributes and employee benefit plans (such as foreign or excess benefit plans) which are not subject to ERISA; and (B) all stock option plans, bonus or incentive award plans, severance pay policies or agreements, deferred compensation agreements, supplemental income arrangements, vacation plans, and all other employee benefit plans, agreements, and arrangements not described in (A) above. In the case of an Employee Program funded through an organization described in Code Section 501(c)(9), each reference to such Employee Program shall include a reference to such organization;

(ii) an entity "maintains" an Employee Program if such entity sponsors, contributes to, or provides (or has promised to provide) benefits under such Employee Program, or has any obligation (by agreement or under applicable law) to contribute to or provide benefits under such Employee Program, or if such Employee Program provides benefits to or otherwise covers employees of such entity (or their spouses, dependents, or beneficiaries);

(iii) An entity is an "Affiliate" of any of Prolab or any of their respective Subsidiaries for purposes of this Section 3.22 if it would have ever been considered a single employer with such Company or such Subsidiary under ERISA Section 4001(b) or part of the same "controlled group" as Prolab for purposes of ERISA Section 302(d)(8)(C), and in any case includes each Subsidiary; and

(iv) "Multiemployer Plan" means a (pension or non-pension) employee benefit plan to which more than one employer contributes and which is maintained pursuant to one or more collective bargaining agreements.

22

Section 3.23. Environmental Matters.

(a)   Except as set forth in Section 3.23 of the Disclosure Schedule, (i) Prolab has not generated, transported, used, stored, treated, disposed of, or managed any Hazardous Waste (as defined below); (ii) no Hazardous Material (as defined below) has ever been or is threatened to be spilled, released, or disposed of at any site presently or formerly owned, operated, leased, or used by Prolab, or has ever come to be located in the soil or groundwater at any such site; (iii) no Hazardous Material has ever been transported from any site presently or formerly owned, operated, leased, or used by Prolab for treatment, storage, or disposal at any other place; (iv) Prolab does not presently own, operate, lease, or use, and has not previously owned, operated, leased, or used any site on which underground storage tanks are or were located; and (v) no lien has ever been imposed by any governmental agency on any property, facility, machinery, or equipment owned, operated, leased, or used by Prolab in connection with the presence of any Hazardous Material.

(b)   Except as set forth in Section 3.23 of the Disclosure Schedule, to the Best knowledge of the Stockholders, (i) Prolab has no liability under, and has not violated in any material respect, any Environmental Law (as defined below); (ii) Prolab, any property owned, operated, leased, or used by it, and any facilities and operations thereon are presently in compliance in all material respects with all applicable Environmental Laws; (iii) Prolab has not entered into or been subject to any judgment, consent decree, compliance order, or administrative order with respect to any environmental or health and safety matter or received any request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim with respect to any environmental or health and safety matter or the enforcement of any Environmental Law; and (iv) none of the Stockholders has any reason to believe that any of the items enumerated in clause (iii) of this paragraph will be forthcoming.

(c)   Except as set forth in Section 3.23 of the Disclosure Schedule, to the best knowledge of the Stockholders, no site owned, operated, leased, or used by Prolab or its Subsidiaries contains any asbestos or asbestos-containing material, any polychlorinated biphenyls ("PCBs") or equipment containing PCBs, or any urea formaldehyde foam insulation.

(d)   Prolab has provided to Natrol copies of all documents, records, and information available to them concerning any environmental or health and safety matter relevant to any them, whether generated by them or others, including, without limitation, environmental audits, environmental risk assessments, site assessments, documentation regarding off-site disposal of Hazardous Materials, spill control plans, and reports, correspondence, permits, licenses, approvals, consents, and other authorizations related to environmental or health and safety matters issued by any governmental agency.

23

(e)     For purposes of this Section 3.23, (i) "Hazardous Material" shall mean and include any hazardous waste, hazardous material, hazardous substance, petroleum product, oil, toxic substance, pollutant, or contaminant, as defined or regulated under any Environmental Law; (ii) "Hazardous Waste" shall mean and include any hazardous waste as defined or regulated under any Environmental Law; (iii) "Environmental Law" shall mean any applicable environmental or health and safety-related law, regulation, rule, ordinance, or by-law at the federal, state, or local level, existing as of the date hereof or previously enforced; and (iv) the "Companies" shall mean and include each of Prolab, their respective Subsidiaries, their respective predecessors and all other entities for whose conduct such Company or any such Subsidiary is or may be held responsible under any Environmental Law.

Section 3.24. Insurance. The physical properties, assets, business, operations, employees, officers and directors of Prolab are insured to the extent disclosed in Section 3.24 of the Disclosure Schedule. There is no claim by Prolab pending under any such policies as to which coverage has been questioned, denied or disputed by the insurer. Said insurance policies and arrangements are in full force and effect, all premiums with respect thereto are currently paid, and Prolab is in compliance in all material respects with the terms thereof. Such insurance is sufficient for compliance by Prolab with all requirements of applicable law and all agreements and leases to which it is a party. Except as set forth in Section 3.24 of the Disclosure Schedule, the execution of this Agreement and consummation of the transactions contemplated hereby shall not result in the termination of any such insurance policy or in coverage of possible losses and liabilities covered thereby otherwise available thereunder becoming unavailable.

Section 3.25. Relationship with Customers and Suppliers. The relationships of Prolab with its customers and suppliers are good commercial working relationships. Set forth in Section 3.25 of the Disclosure Schedule is a list of the top 50 customers of Prolab by sales for the year ended December 31, 1998 and for the eight month period ended August 31, 1999. Except as set forth in Section 3.25 of the Disclosure Schedule, no Material Customer has canceled or otherwise terminated its relationship with Prolab or, has during said period decreased materially its usage, purchase, or provision, as the case may be, of the services or products of Prolab. Except as set forth in Section 3.25 of the Disclosure Schedule no such Material Customer has, to the best knowledge of the Stockholders, any plan or intention to terminate, to cancel or otherwise materially and adversely modify its relationship with Prolab or to decrease materially or limit its usage, purchase, or provision, as the case may be, of the services or products of such company. Section 3.25 of the Disclosure Schedule sets forth a list of all suppliers and vendors of Prolab to whom during the fiscal year ended December 31, 1998 Prolab made payments aggregating $100,000 or more, showing, with respect to each, the name, address and dollar volume involved. No such supplier or vendor has prematurely terminated or reduced its business with Prolab or materially and adversely modified its relationship with Prolab nor has Prolab or any Stockholder received written notice that any such supplier or vendor have any plan or intention to do so.

Section 3.26. Investment Representations.

(a) Each Stockholder represents that such Stockholder has had an opportunity to ask questions of the principal officers and representatives of Natrol and to obtain any additional information necessary to permit an evaluation of the benefits and risks associated with the investment made hereby. Each Stockholder confirms that such Stockholder has received and read the information provided by the Company which includes (i) Natrol's Annual Report on Form 10-K for the fiscal year ended December 31, 1998, (ii) Natrol's Proxy Statement dated May 11, 1999 and (iii) Natrol's Annual Report to Shareholders for the fiscal year ended December 31, 1998 (iv) Natrol's Quarterly Reports on Form 10-Q, for each of the three-month periods ended March 31, 1999, and June 30, 1999. (the "Informational Materials") and specifically confirms that such Stockholder fully understands information contained in the Informational Materials.

(b) Each Stockholder represents that such Stockholder is an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, and has such knowledge and experience in business, financial and investment matters that such Stockholder is capable of evaluating the merits and risks involved in the investment made hereby and further represents that such Stockholder is able to bear the economic risk of such investment for an indefinite period of time or to lose the entire investment made hereby.

(c) Each Stockholder hereby represents that such Stockholder is acquiring the Natrol Common Stock for his own account and not with a view to any sale or distribution thereof within the meaning of the Securities Act of 1933, as amended (the "Act"), and the rules and regulations of the Securities and Exchange Commission thereunder as amended from time to time (the "Regulations"), except to the extent permitted by the Act and the Regulations. Each Stockholder agrees that such Stockholder will make no sale, offer to sell or transfer of any Natrol Common Stock in violation of the Act, the Regulations or any other federal or state securities law, or in violation of the terms of this Agreement.

(d) Each Stockholder understands that neither the Natrol Common Stock nor the offer and sale thereof has been or will be registered under the Act or the securities laws of any state and that such Natrol Common Stock may not be sold, offered for sale or transferred for an indefinite period of time unless and until (i) a registration statement with respect thereto is in effect under the Act and applicable state laws or (ii) the Stockholder shall establish to the satisfaction of the Natrol and its counsel that the proposed transaction is exempt from registration under the Act and applicable state laws or that registration under the Act and applicable state laws is not required. The foregoing restrictions and provisions shall apply to any subsequent holder or transferee of any Natrol Common Stock. Each Stockholder acknowledges that and agrees that the certificate(s) representing the shares of Natrol Common Stock to be issued to the Stockholders hereunder shall bear a legend substantially in the following form:

25

Case 3:01-cv-02415-AVC   Document 51-4   Filed 11/18/2003   Page 5 of 15

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE ASSIGNED EXCEPT PURSUANT TO (1) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES WHICH IS EFFECTIVE UNDER SUCH ACT OR (2) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER SUCH ACT RELATING TO THE DISPOSITION OF SUCH SECURITIES."

Natrol agrees that it will cause its transfer agent to remove such legend upon receipt of an opinion of counsel satisfactory to such transfer agent to the effect that such shares may be transferred free of restrictions and certificates therefor may be issued free of any restrictive legend.

(e) Each Stockholder represents that such Stockholder is an individual residing in the state listed on Schedule 1.02 hereof and that all negotiations concerning the investment made hereby have taken place in such state.

(f) Each Stockholder acknowledges that pursuant to Rule 144 of the Securities and Exchange Commission, they may not sell or otherwise dispose of the Natrol Common Stock acquired pursuant hereto for a period of one (1) year from the date hereof.

Section 3.27. <u>Corporate Records; Copies of Documents</u>. The corporate record books of Prolab accurately record all material corporate action taken by their respective stockholders and board of directors and committees. The copies of such corporate records, as made available to Natrol for review, are true and complete copies of the originals of such documents.

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF NATROL.

Section 4.01. <u>Making of Representations and Warranties</u>. As a material inducement to the Stockholders to enter into this Agreement and consummate the transactions contemplated hereby, Natrol hereby makes to them the representations and warranties contained in this Article IV.

Section 4.02. <u>Organization and Corporate Power</u>. Natrol is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with full corporate power and authority to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted and to enter into this Agreement and each agreement, document and instrument to

12/18/01 TUE 23:01 [TX/RX NO 6518]

be executed and delivered by it pursuant to or as contemplated by this Agreement and to carry out the transactions contemplated hereby and thereby.

Section 4.03. Authority. The execution, delivery and performance of this Agreement and each agreement, document and instrument to be executed and delivered by Natrol pursuant to this Agreement have been duly authorized by all necessary corporate action of Natrol, and no other corporate action on the part of Natrol or its stockholders is required in connection therewith. This Agreement and each such agreement, document and instrument constitutes, or when executed and delivered by Natrol will constitute, valid and binding obligations of Natrol enforceable in accordance with their respective terms. The execution, delivery and performance by Natrol of this Agreement and each such agreement, document and instrument:

(a) do not and will not violate any provisions of the Certificate of Incorporation or by-laws of Natrol;

(b) do not and will not result in any violation by Natrol of any laws, rules or regulations of the United States or any state or other jurisdiction applicable to Natrol, or require Natrol to obtain any approval, consent or waiver of, or to make any filing with, any Person (governmental or otherwise) that has not been obtained or made; and

(c) do not and will not result in a breach of, constitute a default under, accelerate any obligation under or give rise to a right of termination of any indenture or loan or credit agreement or any other agreement, contract, instrument, mortgage, lien, order, writ, judgment, injunction, decree, determination or arbitration award to which Natrol is a party or by which the property of Natrol is bound or affected, or result in the creation or imposition of any mortgage, pledge, lien, security interest or other charge or encumbrance on any property or asset owned by Natrol.

Section 4.04. Investment Banking; Brokerage. Except for a payment to Gardiner & Rouen, of San Marino, CA. There are no claims for investment banking fees, brokerage commissions, finder's fees or similar compensation (exclusive of professional fees of lawyers and accountants) in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Natrol.

## ARTICLE V. SURVIVAL; INDEMNIFICATION.

Section 5.01. Survival of Representations, Warranties, Etc. All representations, warranties, agreements, covenants and obligations herein or in any schedule or certificate delivered by any party incident to the transactions contemplated hereby are material and may be relied upon by the party receiving the same and shall survive the Closing regardless of any

investigation by or knowledge of such party and shall not merge into the performance of any obligation by any party hereto, subject to the provisions of this Article V.

Section 5.02. Indemnification by the Stockholders. Each of the Stockholders, on behalf of themselves and their respective successors, executors, administrators, estates, heirs and permitted assigns as contemplated by Section 6.04, jointly and severally, subject to Section 5.02(b), agree subsequent to the Closing Date to indemnify and hold harmless Natrol, its affiliates and their respective shareholders, officers, directors, employees and agents (individually, a "Buyer Indemnified Party" and collectively, the "Buyer Indemnified Parties") from and against and in respect of all losses, liabilities, obligations, damages, deficiencies, actions, suits, proceedings, demands, assessments, orders, judgments, fines, penalties, costs and expenses (including the reasonable fees, disbursements and expenses of attorneys, accountants and consultants) of any kind or nature whatsoever (whether or not arising out of third-party claims and including all amounts paid in investigation, defense or settlement of the foregoing and including any loss of Tax benefit or increase in Taxes payable for future periods) sustained, suffered or incurred by or made against any Buyer Indemnified Party (a "Loss" or "Losses") arising out of, based upon or in connection with:

(a) any inaccuracy or breach of any representation or warranty made by Prolab or the Stockholders, in this Agreement or in any schedule, exhibit, certificate, financial statement, agreement or other instrument delivered under or in connection with this Agreement;

(b) material undisclosed liabilities known to any of the Stockholders relating to the activities or conduct of the business of Prolab on or prior to the Closing Date, including without limitation (i) any and all claims for or resulting from or connected with products sold or services provided by Prolab prior to the Closing Date or otherwise relating to events occurring on or prior to the Closing Date, (ii) amounts due in connection with any Employee Program (as defined in Section 3.22), (iii) Losses relating to the failure of Prolab to comply with applicable laws or regulations, and (iv) Losses with respect to Taxes for periods on or prior to the Closing Date;

(c) the Basic Litigation (as defined in Section 1.02(b) above);

(d) challenges, claims, proceedings or filings made by, with or on behalf of, the Federal Trade Commission or the Federal Drug Administration or any comparable state agency (an "Agency") relating to any advertising or promotional materials of Prolab existing on or before the Closing Date and any product labels of Prolab existing on or before the Closing Date regardless of whether such advertising or promotional materials were distributed or such products were sold before or after the Closing Date; and

(e) any fees and expenses (including without limitation legal fees and accounting fees) relating to this Agreement or any transactions contemplated hereby paid, assumed or otherwise borne by Prolab except (i) to the extent such fees and expenses have been reflected in the calculation of the Adjustment Amount pursuant to Section 1.03(a) hereof and (ii) the costs and expenses incurred by Prolab in connection with the Audit.

Claims under clauses (a) through (e) of this Section 5.02 hereinafter collectively referred to as "Buyer Indemnifiable Claims".

The rights of Buyer Indemnified Parties to recover indemnification in respect of any occurrence referred to in clauses (b) through (e) of this Section 5.02 shall not be limited by the fact that such occurrence may not constitute an inaccuracy in or breach of any representation or warranty referred to in clause (a) of this Section 5.02.

Section 5.03. Limitations on Indemnification by Stockholders.

(a) General Threshold. Subject to the exceptions set forth in Sections 5.03(d) and (e), the Stockholders and shall not be obligated to indemnify Company Indemnified Parties in respect of Buyer Indemnifiable Claims except to the extent the cumulative amount of all Buyer Indemnifiable Claims exceeds Fifty Thousand Dollars ($50,000) (the "Buyer Threshold"), which excess cumulative amount shall be recoverable in accordance with the terms hereof; provided, however, that the Buyer Indemnified Parties shall be entitled to dollar-for-dollar recovery with respect to Losses involving a breach of the representations and warranties contained in Sections 3.02, 3.03, 3.05, 3.09(iii), 3.11, 3.13 or 3.21.

(b) General Maximum Indemnification. Subject to the exceptions set forth in Sections 5.03(d) and (e), the Stockholders shall not be obligated to indemnify Buyer Indemnified Parties in respect of Buyer Indemnifiable Claims after the cumulative amount of all Buyer Indemnifiable Claims exceeds forty percent (40%) of the Total Purchase Price.

(c) Time Limits for Claims. Subject to the exceptions set forth in Sections 5.03(d) and (e), no claim for indemnification may be made by any Buyer Indemnified Party in respect of Buyer Indemnifiable Claims unless the written notice required by Section 5.06 with respect to such Losses shall have been received by the Representative a date prior to the second anniversary of the Closing Date; provided, however, that the limitation of this clause (c) shall not apply to (A) Buyer Indemnifiable Losses described in Section 5.02(c), (B) Buyer Indemnifiable Losses involving a breach of the representations and warranties contained in Sections 3.02, 3.03, 3.05, 3.09(iii), 3.11, 3.13 or 3.21 and (C) Buyer Indemnifiable Losses with respect to Taxes of Prolab, indemnification with respect to which shall expire six (6) months after the termination of the applicable statute of limitations relating to the subject matter covered by such Section; and provided further, that in each case if prior

to the applicable date of expiration a specific state of facts shall have become known which may constitute or give rise to any Buyer Indemnifiable Loss as to which indemnity may be payable and a Buyer Indemnified Party shall have given notice of such facts to the Stockholders and made a claim for indemnification within six months thereafter, then the right to indemnification with respect thereto shall remain in effect until such matter shall have been finally determined and disposed of, and any indemnification due in respect thereof shall have been paid, according to the date on which notice of the applicable claim is given.

(d)    Dollar-for-Dollar Claims. Notwithstanding anything herein to the contrary, Buyer Indemnified Parties shall not be subject to any limitation, whether pursuant to this Section 5.03 or otherwise, and shall be entitled to dollar-for-dollar recovery, in seeking indemnification from any Stockholder with respect to the following:

(i)    Losses arising from fraud or an intentional misrepresentation on the part of or any Stockholder;

(ii)    Losses arising from breach of the representations and warranties contained in Sections 3.02, 3.03, 3.05, 3.09(iii), 3.11, 3.13 or 3.21 or a covenant by any Stockholder; or any

(iii)    Losses described in Section 5.02(b), 5.02(c) or 5.02(e).

(e)    Agency Claims. Notwithstanding anything herein to the contrary, with respect to Losses described in Section 5.02(d), Buyer Indemnified Parties shall not be subject to the limitations set forth in Sections 5.03(a) through (d) above, but shall be entitled to recover from the Stockholders fifty percent (50%) of all Losses described in Section 5.02(d) which arise prior to the first anniversary of the Closing Date.

Section 5.04. Indemnification by Natrol. Natrol agrees subsequent to the Closing Date to indemnify and hold harmless the Stockholders from and against and in respect of all Losses sustained, suffered or incurred by or made against any of them arising out of, based upon or in connection with (a) any inaccuracy or breach of any representation or warranty made by Natrol in this Agreement or in any schedule, exhibit, certificate, financial statement, agreement or other instrument delivered under or in connection with this Agreement; and (b) any breach of any covenant or agreement made by Natrol in this Agreement or in any schedule, exhibit, certificate, financial statement, agreement or other instrument delivered under or in connection with this Agreement (such claims under clauses (a) and (b) being hereinafter collectively referred to as "Seller Indemnifiable Claims").

Section 5.05. Limitations on Indemnification by Natrol.

(a) Time Limit for Claims; General Threshold. The right of any Stockholder to indemnification under Section 5.04 shall be subject to the following provisions:

(i) Indemnification with respect to Seller Indemnifiable Claims shall expire on the third anniversary of the Closing Date.

(ii) No indemnification shall be payable with respect to Seller Indemnifiable Claims except to the extent that the cumulative amount of all Seller Indemnifiable Claims shall exceed $50,000, which excess cumulative amount shall be recoverable in accordance with the terms hereof.

(b) Certain Matters. Notwithstanding anything herein to the contrary, the Stockholders shall not be subject to limitation, whether pursuant to Section 5.05(a) hereof or otherwise, in seeking indemnification with respect to any Seller Indemnifiable Claim (i) involving fraud or an intentional misrepresentation by Natrol, (ii) arising from breach of a covenant by Natrol or (iii) involving a breach by Natrol of the representations and warranties contained in Sections 4.03 and 4.04 hereof.

Section 5.06. Notice; Defense of Claims.

(a) Promptly after receipt by an indemnified party of notice of any claim, liability or expense to which the indemnification obligations hereunder would apply, the indemnified party shall give notice thereof in writing to the indemnifying party (Natrol with respect to claims by any Stockholder and the Representative, with respect to claims by Buyer Indemnified Parties), but the omission to so notify the indemnifying party promptly will not relieve the indemnifying party from any liability except to the extent that the indemnifying party shall have been prejudiced as a result of the failure or delay in giving such notice. Such notice shall state the information then available regarding the amount and nature of such claim, liability or expense and shall specify the provision or provisions of this Agreement under which the liability or obligation is asserted. Other than with respect to the Basic Litigation and proceedings referred to in Section 5.02(d) ("Agency Proceedings"), if within 20 business days after receiving such notice the indemnifying party gives written notice to the indemnified party stating that (i) it would be liable under the provisions hereof for indemnity in the amount of such claim if such claim were successful (ii) that it shall be fully responsible (with no reservation of any rights) for all liabilities relating to such claim, liability or expense and that it will provide full indemnification (whether or not otherwise required hereunder) to the indemnified party with respect to such claim, liability or expense and (iii) that it disputes and intends to defend against such claim, liability or expense at its own cost and expense, then counsel for the defense shall be selected by the indemnifying party (subject to the consent of the indemnified party which consent shall not be unreasonably withheld) and the indemnified

31

party shall not be required to make any payment with respect to such claim, liability or expense as long as the indemnifying party is conducting a good faith and diligent defense at its own expense; provided, however, that the assumption of defense of any such matters by the indemnifying party shall relate solely to the claim, liability or expense that is subject or potentially subject to indemnification, and provided further that prior to such assumption of defense the indemnifying party shall enter into an agreement with the indemnified party in form and substance satisfactory to the indemnified party pursuant to which the indemnifying party (i) unconditionally guarantees the payment and performance of any liability or obligation which may arise out of or in any way relating to such claim, liability or expense or the facts giving rise thereto and (ii) provides the indemnified party with evidence reasonably acceptable to the indemnified party that the indemnifying party will have the financial resources to defend the claim, liability or expense and to pay and perform any liability or obligation which may arise out of or in any way relating to such claim, liability or expense or the facts giving rise thereto. The indemnifying party shall have the right, with the consent of the indemnified party, which consent shall not be unreasonably withheld, to settle all indemnifiable matters related to claims by third parties which are susceptible to being settled provided its obligation to indemnify the indemnifying party therefor will be fully satisfied. The indemnifying party shall keep the indemnified party apprised of the status of the claim, liability or expense and any resulting suit, proceeding or enforcement action, shall furnish the indemnified party with all documents and information that the indemnified party shall reasonably request and shall consult with the indemnified party prior to acting on major matters, including settlement discussions. Notwithstanding anything herein stated to the contrary, the indemnified party shall at all times have the right to fully participate in such defense at its own expense directly or through counsel; provided, however, if the named parties to the action or proceeding include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would, in the reasonable judgment of the indemnified party and its counsel, be inappropriate under applicable standards of professional conduct, the expense of separate counsel for the indemnified party shall be paid by the indemnifying party. If no such notice of intent to dispute and defend is given by the indemnifying party, or if such diligent good faith defense is not being or ceases to be conducted, the indemnified party shall, at the expense of the indemnifying party, undertake the defense of (with counsel selected by the indemnified party), and shall have the right to compromise or settle (exercising reasonable business judgment), such claim, liability or expense. If such claim, liability or expense is one that by its nature cannot be defended solely by the indemnifying party, then the indemnified party shall make available all information and assistance that the indemnifying party may reasonably request and shall cooperate with the indemnifying party in such defense.

    (b)    Notwithstanding the provisions of Section 5.06(a), the Stockholders shall not be entitled to assume the defense of the Basic Litigation or any Agency Proceeding in accordance with Section 5.06(a). The defense of the Basic Litigation or any Agency Proceeding shall be conducted by or at the direction of Natrol. The Representative shall be entitled to receive any and all information reasonably requested by him with respect to the

Basic Litigation or any Agency Proceeding and shall be entitled to participate with representatives of Natrol in the defense of the Basic Litigation or any Agency Proceeding. Each of the Stockholders agrees to cooperate with the defense of the Basic Litigation or any Agency Proceeding by Natrol and shall take all actions reasonably requested by Natrol in connection therewith. Notwithstanding the foregoing, Natrol shall not have the right to settle the Basic Litigation or any Agency Proceeding without the consent of the Representative, which consent shall not be unreasonably withheld.

Section 5.07. Recoveries. The amount of any Losses suffered, sustained, incurred or required to be paid by an indemnifying party shall be reduced by the amount of any insurance proceeds or other amounts relating to such Losses paid to the indemnified party by any Person not a party to this Agreement.

Section 5.08. Satisfaction of Stockholder Indemnification Obligations. In order to satisfy the indemnification obligations of the Stockholders pursuant to Sections 5.02 and 5.03 above, a Buyer Indemnified Party shall have the right (in addition to collecting directly from the Stockholders) to set off its indemnification claims against any and all amounts payable by Natrol to any Stockholder under this Agreement or otherwise. In addition to all other remedies available to Buyer Indemnified Party, in order to satisfy the indemnification obligations of the Stockholders pursuant to Section 5.02(c), Natrol, on behalf of any Buyer Indemnified Party, shall have the right to reduce the Stock Payment as further set forth in Section 1.02(b).

## ARTICLE VI. MISCELLANEOUS.

Section 6.01. Law Governing. This Agreement shall be construed under and governed by the internal laws, and not the law of conflicts, of the State of Delaware.

Section 6.02. Notices. Any notice, request, demand or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given if delivered or sent by facsimile transmission, upon receipt, or if sent by registered or certified mail upon the sooner of the expiration of three days after deposit in United States post office facilities properly addressed with postage prepaid or acknowledgment of receipt, as follows:

To Natrol:        Natrol Professional Services, Inc.
                  21411 Prairie Street
                  Chatsworth, CA 91311
                  Attention: Dennis Jolicoeur, Senior Vice President

33

|                       |                                                                                                  |
|-----------------------|--------------------------------------------------------------------------------------------------|
| with a copy to:       | Goodwin, Procter & Hoar LLP<br>Exchange Place<br>Boston, MA 02109-2881<br>Attn: John R. LeClaire, P.C. |
| To the Representative: | Thomas E. Roark<br>23 Far Hills<br>Avon, CT 06001                                                |
| with a copy to:       | Law Offices of Alan B. Silver<br>Bushnell Tower<br>One Gold Street, Suite S<br>Hartford, CT 06103-2914<br>Attn: Alan B. Silver |

or to such other address of which any party may notify the other parties as provided above.

Section 6.03. **Prior Agreements Superseded**. This Agreement supersedes all prior understandings and agreements among the parties relating to the subject matter hereof, including without limitation the letter agreement dated August 10, 1999.

Section 6.04. **Assignability**. This Agreement shall be assignable by Natrol after payment of any amounts owing to the Stockholders under Section 1.02, although no such assignment shall relieve Natrol of any of its liabilities or obligations under this Agreement. This Agreement shall not otherwise be assignable by Natrol without the prior written consent of the Representative, or by any of the Stockholders without the prior written consent of Natrol. This Agreement (including without limitation the provisions of Article V) shall be binding upon and enforceable by, and shall inure to the benefit of, the parties hereto and their respective successors, heirs, executors, administrators and permitted assigns, and no others. Notwithstanding the foregoing, nothing in this Agreement is intended to give any Person not named herein the benefit of any legal or equitable right, remedy or claim under this Agreement, except as expressly provided herein.

Section 6.05. **Fees and Expenses**. Each of Natrol and each of the Stockholders shall pay its or his own expenses and costs associated with the preparation of this Agreement and the consummation of the transactions contemplated hereby; provided, however, that the Stockholders may cause Prolab to pay the expenses of the Stockholders and such payment shall be considered in the preparation of and fully accounted for on the Estimated Closing Balance Sheet and the effect thereof shall be fully reflected in adjustments to the Total Purchase Price pursuant to Section 1.03 hereof.

Section 6.06. **Publicity and Disclosures**. A joint initial press release shall be made at the time of execution of this Agreement announcing that this Agreement has been signed. Such press release shall be in form and substance reasonably acceptable to the parties hereto.

Section 6.07. **Captions and Gender**. The Captions in this Agreement are for convenience only and shall not affect the construction or interpretation of any term or provision hereof. The use in this Agreement of the masculine pronoun in reference to a party hereto shall be deemed to include the feminine or neuter pronoun, as the context may require.

Section 6.08. **Execution in Counterparts**. For the convenience of the parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

Section 6.09. **Certain Remedies; Severability**. It is specifically understood and agreed that any breach of this Agreement by any of the parties hereto (including any breach of Article II by Mr. Roark, Mr. Morin or Mr. Esposito) will result in irreparable injury to the aggrieved party, that the remedy at law alone will be an inadequate remedy for such breach and that, in addition to any other remedy for such breach and that, in addition to any other remedy it may have, such aggrieved party shall be entitled to enforce the specific performance of this Agreement by the breaching party and to seek both temporary and permanent injunctive relief, without the necessity of proving actual damages, but without limitation of their rights to recover such damages. In case any of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, any such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had been limited or modified (consistent with its general intent) to the extent necessary to make it valid, legal and enforceable, or if it shall not be possible to so limit or modify such invalid, illegal or unenforceable provision or part of a provision, this Agreement shall be construed as if such invalid, illegal or unenforceable provision or part of a provision had never been contained in this Agreement. Notwithstanding the foregoing, however, each of Mr. Roark, Mr. Morin and Mr. Esposito acknowledges and agrees that the provisions of Article II are reasonable in context and scope, are a material condition to Natrol's willingness to purchase his interest in Prolab and are intended to be and shall be enforced to the full extent set forth herein.

Section 6.10. **Amendments; Waivers**. This Agreement may not be amended or modified except by a writing duly and validly executed by each Stockholder and Natrol. Any party hereto may waive any covenant or condition intended for its benefit in its discretion, but delay on the party of any party in exercising any right, power or privilege hereunder shall not operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege. The rights and remedies of any party arising out of or otherwise in

respect of any inaccuracy in or breach of any representation or warranty, or any failure to perform or comply with any covenant or agreement, contained in this Agreement shall in no way be limited by the fact that the act, omission, occurrence or other state of facts upon which any claim of any such inaccuracy, breach or failure is based may also be the subject matter of any other representation, warranty, covenant or agreement contained in this Agreement (or in any other agreement between the parties) as to which there is no inaccuracy, breach or failure.